[Cite as *State v. Bender-Adams*, 2025-Ohio-1364.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 113366 |
| SIRTRUCE BENDER-ADAMS, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** APPLICATION DENIED
**RELEASED AND JOURNALIZED:** April 16, 2025

Cuyahoga County Court of Common Pleas
Case No. CR-22-673864-B
Application for Reopening
Motion No. 580109

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Chauncey Keller, Assistant Prosecuting Attorney, *for appellee.*

Sirtruce Bender-Adams, *pro se.*

EILEEN A. GALLAGHER, A.J.:

{¶ 1} On December 10, 2024, the applicant, Sirtruce Bender-Adams, pursuant to App.R. 26(B), applied to reopen this court's judgment in *State v. Bender-Adams,* 2024-Ohio-4897 (8th Dist.), in which this court affirmed his

convictions for aggravated murder, murder, aggravated burglary, burglary, felonious assault and having a weapon while under disability. Bender-Adams now argues that his appellate counsel was ineffective for not raising the following errors on appeal: "(1) Failure to raise Napue Claim in which prosecutors used false testimony, (2) Failure to put on the record proof of actual innocence and failure to investigate evidence and (3) Manifested weight of the evidence." The State filed its brief in opposition on January 9, 2025, and Bender-Adams filed a supplemental motion on February 20, 2025. For the following reasons, this court denies the application to reopen.

**Facts and Procedural Background**

{¶ 2} James Randalf encountered the defendant, Sirtruce Bender-Adams, in April 2022. Randalf's brother brought the defendant to help Randolf move. However, instead of helping with the move, the defendant, who was in the landscaping business, concerned himself with Randalf's lawn mower. Overnight the lawnmower disappeared, and Randalf accused the defendant of stealing it.

{¶ 3} Approximately one month later Randalf was riding with his long-standing friend, Quemonte Leonard, to Leonard's home and saw the defendant riding his dirt bike on the street. After Leonard drove to his home and went inside, the defendant confronted Randalf about accusing him of stealing the lawn mower and a shouting and pushing match ensued. As Randalf was walking into Leonard's home, the defendant punched him in the back of the head. Leonard came out of his

house and told the defendant to chill and leave. In response, the defendant yelled, "I will f*** you up." (Tr. 1110 – 1111.)

{¶ 4} Edward Harris and the defendant were long-standing friends. On July 8, 2022, Harris had borrowed a white Toyota Camry that belonged to a female friend, QuiShonti Trent. At approximately 7:00 a.m., Harris drove to the defendant's house because he was going to "front" the defendant marijuana for a sale.

{¶ 5} Harris then drove the defendant to Leonard's house. Video cameras from the area showed the white Camry heading toward Leonard's house; one camera stated the time as 8:37 a.m. Another camera showed the white car parked a few houses away from Leonard's home. Before entering Leonard's house, the defendant asked Harris for a pair of blue plastic gloves. At trial, Harris explained that Trent was a state-tested nurse aide and thus had plastic gloves in the car and that it was not unusual for people dealing in drugs to wear such gloves. (Tr. 1053.)

{¶ 6} According to Harris, while the defendant was in the house, he heard two gunshots. When the defendant returned to the car, Bender-Adams told Harris that they had gotten into a physical altercation and that he had done what he felt he had to do. (Tr. 1049.) The defendant still had marijuana. Video cameras showed a man coming out of Leonard's house and entering a white car on the passenger side. Harris identified the passenger as the defendant and himself as the driver. Cell phone records indicated that the defendant's cell phone was in the area of Leonard's house on July 8, 2022, from 8:42 a.m. to approximately 9:05 a.m.

{¶ 7} Harris drove the defendant back to his home and left the car to relieve himself. Upon returning to the car, the defendant stated, "I got to put the plate on the car." (Tr. 1061.) Later that day, Harris received a $1000 Cash App transaction, presumably from Leonard. Harris admitted that he had been charged as a co-defendant and pled guilty to involuntary manslaughter and complicity in aggravated burglary as part of a plea agreement in which the State agreed to recommend a prison sentence of no more than eight years.[1]

{¶ 8} On July 8, 2022, at 9:23 a.m. police responded to a call of a male shot at Leonard's house. They found Leonard's body lying in the front yard with four shots in the back. A trail of blood led from the house, and the front door was open. Investigation revealed signs of a struggle inside. Couches were flipped over, and drawers had been pulled out. The officers found spent shell casings, a blood trail and the finger of a blue glove. The DNA testing on the shell casings, the plastic glove finger, Leonard's fingernails, Trent's car and the defendant's boots could not confirm that the defendant was at Leonard's house.

{¶ 9} A grand jury indicted the defendant for three counts of aggravated murder, four counts of murder, two counts of aggravated burglary, one count of burglary, two counts of felonious assault all with one- and three-year firearm specifications and one count of having weapons while under disability. During the pretrial proceedings, the defendant represented himself to argue two suppression

---

[1] Harris faced the same charges as the defendant.

motions. During the hearings on these motions, the trial court would not let him confer with standby counsel. After the motions were overruled, the defendant accepted representation again.

{¶ 10} The jury found the defendant guilty of two counts of aggravated murder, four counts of murder, two counts of aggravated burglary and one count of burglary. The trial court found him guilty of having a weapon while under disability. The trial court merged the murder, burglary and felonious assault counts and the one- and three-year firearm specifications and then imposed a mandatory six years for firearm specifications consecutive to life without parole for aggravated murder consecutive to 36 months for having a weapon while under disability.

{¶ 11} The defendant's appellate counsel argued the following: (1) The trial court erred when it admitted other-acts evidence regarding the defendant stealing a lawn mower and assaulting another person; (2) The trial court erred when it did not permit defense counsel to fully cross-examine Harris about the benefits he received from his plea bargain; (3) The trial court inhibited the defendant from exercising his right to self-representation when it would not allow him to ask standby counsel for advice during the suppression hearing; (4) The convictions were not supported by sufficient evidence and (5) The convictions were against the manifest weight of the evidence. Appellate counsel also filed the following supplemental assignment of error: The defendant was denied his right to the effective assistance of counsel as guaranteed to him by the United States and Ohio Constitutions, specifically defense

counsel did not investigate by not seeking doorbell cameras and did not retain expert witnesses to counter the state's witnesses.

{¶ 12} The defendant now argues that his appellate counsel was ineffective.

**Legal Analysis**

{¶ 13} In order to establish a claim of ineffective assistance of appellate counsel, the applicant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989); and *State v. Reed*, 74 Ohio St.3d 534 (1996).

{¶ 14} In *Strickland*, the United States Supreme Court ruled that judicial scrutiny of an attorney's work must be highly deferential. The court noted that it is all too tempting for a defendant to second-guess his lawyer after conviction and that it would be all too easy for a court, examining an unsuccessful defense in hindsight, to conclude that a particular act or omission was deficient. Therefore, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland* at 689.

{¶ 15} Specifically, in regard to claims of ineffective assistance of appellate counsel, the United States Supreme Court has upheld the appellate advocate's prerogative to decide strategy and tactics by selecting what he thinks are the most promising arguments out of all possible contentions. The Court noted:

"Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751-752 (1983). Indeed, including weaker arguments might lessen the impact of the stronger ones. Accordingly, the Court ruled that judges should not second-guess reasonable professional judgments and impose on appellate counsel the duty to raise every "colorable" issue. Such rules would disserve the goal of vigorous and effective advocacy. The Supreme Court of Ohio reaffirmed these principles in *State v. Allen*, 77 Ohio St.3d 172 (1996).

{¶ 16} Moreover, even if a petitioner establishes that an error by his lawyer was professionally unreasonable under all the circumstances of the case, the petitioner must further establish prejudice: but for the unreasonable error there is a reasonable probability that the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland* at 694. A court need not determine whether counsel's performance was deficient before examining prejudice suffered by the defendant as a result of alleged deficiencies. *Bradley* at 143.

{¶ 17} Appellate review is strictly limited to the record. *The Warder, Bushnell & Glessner Co. v. Jacobs*, 58 Ohio St. 77 (1898). Thus, "a reviewing court cannot add matter to the record that was not part of the trial court's proceedings and then decide the appeal on the basis of the new matter." *State v. Ishmail*, 54 Ohio St.2d 402 (1978), paragraph one of the syllabus. "Nor can the effectiveness of

appellate counsel be judged by adding new matter to the record and then arguing that counsel should have raised these new issues revealed by the newly added material." *State v. Moore*, 2001-Ohio-1892. "Clearly, declining to raise claims without record support cannot constitute ineffective assistance of appellate counsel." *State v. Burke,* 2002-Ohio-5310, ¶ 10.

{¶ 18} The defendant's first argument is that the state used perjured evidence to convict him. He proposes that Harris' girlfriend, QuiShonti Trent, was not a state-tested nurse's aide as Harris testified that she was but rather, she worked at a day care as she told detectives in an interview. The defendant continues that if she was just a day-care worker, then there would be no reason for her to have blue gloves in her car and this undermines the State's case. Next, he argues that Harris did not receive the Cash App transaction on July 8, 2022, but two weeks later. He does not specify how he knows this except that "[e]vidence provides that Harris requested from his Cash App to Leonard's Cash App $1000 and received payment several weeks after the crime." (Application, paragraph two.)

{¶ 19} Under *Illinois v. Napue,* 360 U.S. 264 (1959), and *State v. Buehner,* 2021-Ohio-4435, ¶ 74 (8th Dist.), to establish a perjury claim, "a defendant must show (1) testimony was false, (2) the testimony was material, and (3) the prosecution knew it was false." *Coe v. Bell,* 161 F.3d 320, 343 (6th Cir. 1998). "The burden is on the defendants to show the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses does not establish knowing use of false testimony." *Id.* "[A] false statement is material for *Brady* purposes 'if

the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'"

{¶ 20} The defendant has not sustained this burden. Working at a day care facility does not preclude Trent from being a state-tested nurse aide. Being trained in providing basic daily care for people would be advantageous in such a profession. Moreover, even if she was not a state-tested nurse aide, she could still have gloves in her car in July 2022, when the country was coming out of the pandemic.

{¶ 21} Inconsistencies between a witness's sworn statement and another person's unsworn statement does not necessarily establish perjury. Mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony by the state. *State v. Johnson,* 2015-Ohio-4903, ¶ 83, and *United States v. Lockmondy,* 80 F.2d 817 (6th Cir. 1989). Furthermore, the falsity of a sworn statement is not shown by proof of an unsworn contradictory statement, because credit must be given to what a witness says under oath rather than what a witness said when not under oath. *Richardson v. State,* 45 Ohio App. 46 (8th Dist. 1933). It is difficult to conclude that Harris' remark that his girlfriend had gloves in her car because she is a state-tested nurse aid affected the jury's judgment. This was a tangential remark, especially since the DNA test of the glove did not confirm that the defendant wore it.

{¶ 22} The defendant does not state what his source is for the claim that Harris received $1000 from Leonard's Cash App two weeks after Leonard died. Without stating his source, he cannot establish that Harris' testimony was false

much less that the State knew it was false. All of the testimony during trial about the Cash App was that Harris received the money the same day.

{¶ 23} The defendant's second argument is that his trial counsel was ineffective for failing to investigate the incident, proffer exculpatory evidence and object to the perjured testimony. His first point of contention seems to be that the video evidence only shows the suspect leaving the house. There is no video of a suspect entering the house. The defendant argues that further investigation, including from the detectives, would have established that no one went into Leonard's house, thus undermining the State's case and creating a reasonable doubt. Similarly, he argues that his defense counsel should have called Trent as a witness, because she would have testified that she works at a day care, is not a state-tested nurse aide and would not and did not have blue gloves in her car. Likewise, the defendant argues that trial counsel was ineffective for not showing that Harris received the $1000 Cash App two weeks later, rather than the day of the murder. The defendant continues that if presented this would have shown that Harris was lying and that the defendant was not in Leonard's house on July 8, 2022.

{¶ 24} Appellate counsel could not have successfully raised any of these arguments in the direct appeal because they would require speculation or consideration of evidence that is outside of the record. *State v. Bays,* 1999-Ohio-216. Prejudice from the failure to investigate is speculative when the record does not show what investigations trial counsel had performed or what information might have "turned up." *State v. Bridges,* 2015-Ohio-1447, ¶ 13 (8th Dist.) After

reviewing the trial transcript, this court concludes that the failure of trial counsel to object to Harris' testimony does not undermine this court's confidence in the verdict.

{¶ 25} Finally, the defendant argues that the verdict was against the manifest weight of the evidence, because of the lack of video showing him entering the house, the paucity of evidence showing his relationship with Leonard and the lack of DNA evidence showing he was in the house show that he did not commit the crime. However, appellate counsel argued manifest weight when he forcefully concluded the brief: "No reasonable fact-finder could find Bender-Adams was identified as the perpetrator of these crimes. The physical evidence was completely lacking. The testimony of Edward Harris was the only evidence pointing towards Bender-Adams, but that testimony can be easily disregarded as coming from a known liar whose freedom was saved by telling one mor lie." Following the admonitions from the Supreme Courts, this court will not second guess appellate counsel's strategy and tactics in arguing manifest weight in this case.

{¶ 26} Accordingly, this court denies the application to reopen.

_____
EILEEN A. GALLAGHER, ADMINISTRATIVE JUDGE

EMANUELLA D. GROVES, J., and
SEAN C. GALLAGHER, J., CONCUR